IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS JOSEPH CABRAL<br><br>Petitioner,<br><br>vs.<br><br>D. ADAMS, Warden,<br><br>Respondent. | No. C 03-03874 JSW (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Louis J. Cabral, a state prisoner, has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On September 7, 2004, this Court issued an amended order to show cause (docket no. 8). Respondent's answer was filed on January 7, 2005 (docket no. 11). Petitioner's traverse was filed on February 28, 2005 (docket no. 17). After consideration of Petitioner's claims on the merits, this order denies the petition for writ of habeas corpus.

## PROCEDURAL BACKGROUND

A jury in San Benito County convicted Petitioner of the following crimes under the Cal. Penal Code: kidnaping to commit rape (§ 209(b)(1)); forcible rape (§§ 261(a)(2), 667.61(a) and (d)); forcible sodomy (§ 286(c)(2)); forcible oral copulation (§ 288a(c)(2)); and a great bodily injury enhancement (§ 12022.7(a)). Petitioner was found to have suffered six prior serious or felony strike convictions under Cal. Penal Code § 667(b)(I) and § 1179.12(a)-(d) and two prior convictions under § 667(a). The trial court

sentenced Petitioner to 135 years-to life incarceration. On direct appeal, the California Court of Appeal, Sixth Appellate District affirmed the conviction. The Supreme Court of California denied a petition for review on August 14, 2002. Petitioner filed the instant petition on August 21, 2003.

## FACTUAL BACKGROUND

The facts underlying the charged offenses as found by the Court of Appeal of California, Sixth Appellate District, are summarized below:

> On February 26, 1999, Maria L. arrived at the Hillcrest Car Wash between 7:30 and 7:40 a.m. Maria saw a white, "more new than old," GMC truck drive into the car wash. While Maria was "bent down vacuuming," a strong man, whom she later identified as defendant, grabbed her from behind by her mouth and shoulders. They struggled, during which time Maria dropped her sweater and the defendant repeatedly hit Maria and pulled her hair. Defendant dragged Maria to his already opened passenger side door, at which time he beat Maria's head with his fist in order to get her into the rear portion of the truck. He closed the door and immediately entered the driver's seat from where he continued to hit her in the head and body. Defendant threw shirts onto Maria's head and told her to cover her face with them, but she threw them back at him. Although defendant eventually did cover Maria's face with a black T-shirt and continued to hit her, she "was able to see" as they turned onto Fairview and then traveled a dirt or rock road with bumps and holes.
>
> They arrived at a trailer which Maria "was able to see clearly" although defendant tried to cover her eyes. Outside the trailer, she felt wet grass because her shoe had fallen off in the truck. Defendant put his jacket on her head and forcibly carried her into the trailer, where he threw her onto the bed. He next took off Maria's clothing and put his penis in her mouth, hitting her and pulling her hair when she was unable to open her "swollen, bleeding" mouth. He then raped and sodomized Maria. Maria's eyes were tightly covered by the black T-shirt during the sexual assault.
>
> Inside the trailer, Maria told the defendant that she was cold; in response, he put his jacket on her. Defendant tried unsuccessfully to tape her eyes. He then put the black T-shirt over Maria's face again and tied it tightly behind her. Defendant placed a paper grocery bag over the T-shirt on Maria's head and carried her to the truck, again putting her behind the passenger's seat. She repeatedly asked defendant not to kill her and to take her to her house near the Hillcrest apartments. Eventually defendant stopped, carried Maria out of the truck, put her on the ground, "yanked" his jacket off of her, and left.

2

Maria, who still had the black T-shirt over her eyes, pulled it down around her neck and crawled to the door of a house she recognized. Owner Cecilia G. came outside. Crying at the sight of Maria, Cecilia carried her to her son's bedroom. At about 9:10 a.m., Cecilia called the police.

Maria was examined at a hospital in Hollister, where she was found to have suffered injuries including: bruising to her lips, scalp, face, neck, upper extremities, lower legs and breasts; crusted blood on her face and teeth; tenderness in her back and ribs; and rectal pain, which looked acute and were consistent with having just occurred. While in the hospital, Maria described the shoes of her assailant as white Nikes with the brand name written in blue. Also shortly after the incident, Maria told police that her assailant had "a slight beard." But, in court she explained that she had meant "[v]ery little. Hardly any," adding "I will never forget his face, even if he has a beard or whatever he has.

Maria also told police that defendant had "no moustache." In court, she explained that she does not "call a moustache when you have very little," but that defendant "did have a little." Maria testified that, although defendant periodically covered her eyes, she saw his face "many times." She positively identified defendant in a photographic lineup and later independently identified him at trial. Maria said she was "certain about [her] identification as the defendant being the person who raped, sodomized and orally copulated [her] . . . against [her] will."

Sergeant Bob Brooks took photographs at the car wash crime scene. He identified photographs of the sweatshirt found lying in front of the wash bays. He noted that there was hair found inside the sweatshirt and inside the drain in the wash bay. After collecting evidence at the scene, Brooks went to the hospital, where he photographed and interviewed Maria. Maria provided Brooks with a description of the suspect, his vehicle, his trailer and the route he took.

On March 1, Brooks showed Maria a photographic lineup consisting of defendant and five other males.[1] She picked out defendant as the person who had kidnaped and raped her. Upon viewing defendant's picture, Maria became very upset; she "recoiled from the picture into a fetal position and began to sob." The woman who interpreted during the photographic lineup identification process similarly testified that Maria "immediately" pointed out someone in the lineup, saying "That's him. That's him." She added that Maria then "got hysterical and very emotional."

---

[1] On re-cross examination, Maria mistakenly identified prosecutor LaForge as the person who showed her the photographic lineup at her home. In fact, it was Officer Brooks who showed her the lineup at her home. LaForge had subsequently showed Maria the lineup a couple of weeks before the trial.

3

Through a series of photographs, Maria identified defendant's trailer on Los Viboras Road and the bed inside that trailer as the place where she had been taken and raped. Maria identified the blue jacket as the one defendant wore and later placed on her; the jacket was seized from inside the vehicle defendant was driving when he was arrested. Maria identified the Nike shoes that were located in a bag of defendant's clothing defendant's wife had given the police as those she saw defendant wearing while he was trying to tape her eyes. She also identified photographs of defendant's 1995 white "extra cab" pickup truck, as the truck in which she was taken to defendant's trailer.

As part of his investigation, Brooks drove from the Hillcrest Car Wash to defendant's trailer on Los Viboras Road, which, as Maria had described, is a hilly, windy road with potholes in it. Brooks entered the trailer. He testified that the trailer's couch-bed and its cushions matched the description Maria gave "both as to color and to texture." Maria also had given a statement that there were steps leading up to the trailer, and this description matched the entrance to defendant's trailer.

Cecilia G. identified the black London Hard Rock Café T-shirt in evidence as the one Maria had on her when she came to the door. Maria also identified the ripped black T-shirt that was collected from Cecilia's house as the one defendant placed over her face and the one she was still wearing when she crawled to Cecilia's house. Officers Stevens and Boomer took that shirt to San Bruno, where defendant's wife identified it "as being hers." In court, defendant's wife testified that the T-shirt belonged to her, that she purchased it when she was in London in 1989.

The jury watched the videotaped conditional examination of Susan Chandler and received a transcript of that proceeding. During the conditional examination, Chandler testified that, at approximately 7:45 a.m. on February 26, she noticed a "newer" white pickup truck "swerving dramatically" and that it had a "squareness of the bed" and a "tinted background." She identified a photograph of defendant's truck as the vehicle she had seen. As the truck turned on Fairview and pulled to the curb, Chandler saw "a little hand reach up from the seat" and a male driver beat the hand. Traumatized by what she had witnessed, Chandler called the police about an hour after viewing the beating. Chandler conceded that she told the officer that the truck did not have "an extended cab," but at the examination said she "can't swear" whether it was extended or not because she did not get a "good side view" of the truck.

On March 2, 1999, defendant was arrested after a 50-minute high-speed pursuit and confrontation with officers. Defendant agreed to give a statement to Brooks after arrest. In his statement, defendant said he was at his trailer during the early morning of February 26. He left there about 8:30 a.m. and drove his white truck to Richard Herman's house on Ballon Road and arrived there between 8:30 and 8:45 a.m. Gene Castro was also

4

at Herman's house. Defendant stayed there 15-20 minutes, then drove to his San Bruno residence, arriving there at about 11:15-11:30 a.m., at which time construction workers were already at the residence. Defendant said he did not go to the Hillcrest Car Wash.

Maria testified that, on the date of the kidnap and sexual assault, she had bleached blonde hair. On March 4, 1999, Criminalist Melinda Ronka lifted hairs from the couch in defendant's trailer and from defendant's truck, mainly "in the rear passenger section." The hairs were "color-treated or bleached" blonde with dark roots. Ronka found reddish-brown stains on the rear passenger side panel and on the passenger side front seatbelt. Tests done on the stains on the seat belt were presumptively "positive for the presence of blood."

Criminalist Julie Doerr compared the blonde hair with dark roots found in defendant's truck with the similarly colored hairs found in Maria's sweatshirt that was left at the car wash. After examining the hairs, Doerr said it was "possible and perhaps even likely" that the compared hairs came from the same person since they appeared to be "similar" in that they had the same diameter, they had the same loss of pigment granules and break down of the hair structure, and they appeared to have been bleached or dyed at approximately the same period given the dark portion of the roots were a similar size. Doerr visually inspected the hairs that were collected from defendant's trailer, some of which she testified appeared to be similar to the ones she had examined microscopically in that they were "blonde with approximately the same length dark root."

According to a DNA expert, defendant could not be eliminated as a possible source of the semen obtained from Maria's vagina and rectum. The expert explained that, because defendant's DNA was consistent with that of the semen, he "could be the source of the semen."

*People v. Cabral*, No. CRF9936294, slip op. at 1-13 (Cal. Ct. App.)(Pet. Ex. B).

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S. § 2254(a). A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

5

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000)(citing *Williams*, 529 U.S. at 405-07), *overruled on other grounds, Lockyer v. Andrade*, 538 U. S. 63, 70-73 (2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411.; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law). In deciding whether a state court's decision is contrary to, or an reasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of petitioner's

claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

## DISCUSSION

### I. Confrontation Clause

Petitioner asserts that the trial court violated his Sixth Amendment rights to confrontation and cross-examination by admitting at his trial the videotaped conditional testimony of witness Susan Chandler. Under Cal. Penal Code § 1336, a witness may be examined conditionally when she is about to leave the state and will not be present to give live testimony at trial. Petitioner contends that because the prosecution failed to use reasonable diligence and good faith efforts to ensure that Chandler would be present for trial, the admission of the videotaped testimony was improper.

    a.    Legal Standard

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.; see Davis v. Alaska*, 415 U.S. 308, 315 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford*, 541 U.S. at 61; *see, e.g., United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.).

The Confrontation Clause applies to all "testimonial" statements. *See Crawford*, 541 U.S. at 50-51. "Testimony ... is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (citations and quotation marks omitted); *see id.* ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Id.* at 50-51.

Under *Crawford*, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. In *Barber v. Page*, 390 U.S. 719, 724-725 (1968), the Supreme Court held that a witness is not "unavailable" for purposes of the Confrontation Clause "unless the prosecutorial authorities have made a good-faith effort to obtain [her] presence at trial." Defendant's opportunity to cross-examine a witness is satisfied when the cross-examination occurred under circumstances "closely approximating those that surround a typical trial." *California v. Green*, 399 U.S. 149, 165 (1970).

If a Sixth Amendment violation is found, the court must determine whether the error was harmless, or whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

b. Analysis

1. Unavailability of the Witness

In determining whether Chandler was unavailable at the time of trial, the Court of Appeal correctly cited the *Barber* "good faith" standard, but then went on to analyze Chandler's unavailability using California's "reasonable diligence" standard. *Cabral*, slip op. at 15-18. If a state court analyzes a claim under state law, the federal court asks

whether the state law, as explained, is "contrary to" governing federal law. *See Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001). Accordingly, the questions are whether "reasonable diligence" is contrary to *Barber's* "good-faith effort" standard and whether the Court of Appeal's determination was contrary to or an unreasonable interpretation of *Barber*.

As the Ninth Circuit has explained, "(w)hile no court has articulated a standard for the diligence required of the prosecution . . . it is clear that herculean efforts are not constitutionally required." *Christian v. Rhodes*, 41 F.3d 461, 467 (9th Cir. 1994). The Court of Appeal found that the prosecution's efforts were sufficient under the circumstances of this case. The prosecution did arrange and secure Chandler's presence in the county during the time the trial was supposed to take place. Additionally, the delay in trial was not caused by conduct of the prosecution, but instead by the seating of a new jury after the court found the defense had failed to explain the striking of two of thirteen consecutive women jurors stricken by the defense after a prosecution motion under *People v. Wheeler*, 22 Cal. 3d 258 (Cal. 1978) and *Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that after a prima facie case of discrimination through the use of peremptory challenges is established, the allegedly biased party must proffer legitimate explanations for striking jurors of a protected class). *Cabral*, slip op. at 16. Based upon these facts, the Court of Appeal reasonably concluded that the prosecution's efforts to secure Chandler's presence were adequate and that she was "unavailable" within the meaning of *Barber*.

        2.      <u>Prior Opportunity to Cross-Examine</u>

The Court of Appeal found that Petitioner had a prior opportunity to cross-examine Chandler, as required under the Confrontation Clause. *Crawford*, 541 U.S. at 68 ("the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination"). Additionally, the Court of Appeal noted that Chandler was under oath during her conditional examination testimony.

9

Although a defendant's right to confront and cross-examine witnesses is fundamental to a fair trial, the Supreme Court has consistently affirmed that "the right to confront and cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (citing *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). In *Green*, 399 U.S. at 166, the Court held that the prosecution could introduce a witness' preliminary hearing testimony at the defendant's trial because the preliminary hearing provided "substantial compliance with the purposes behind the confrontation requirement." In other words, the opportunity to cross-examine is satisfied when the prosecution is not at fault for the witness' unavailability and the prior proceedings are not "significantly different from an actual trial to warrant distinguishing the two cases for purposes of the Confrontation Clause." *Id.* at 165.

Such is the case here. As discussed above, the prosecution made a good faith effort to secure Chandler's presence at trial. Chandler's testimony was given under oath while Petitioner was represented by counsel who cross-examined her and the proceedings were conducted before a judge who provided a record of the testimony. RT at 41-57. The conditional testimony proceedings closely resemble a trial and as such the Court of Appeal did not unreasonably apply federal law when it determined that Petitioner had an adequate prior opportunity to cross-examine Chandler. *See Green*, 399 U.S. at 165.

Because the Court of Appeal determined under governing federal law that Chandler was "unavailable" to testify at trial and that Petitioner had a prior opportunity to cross-examine her, it's rejection of Petitioner's Confrontation Clause violation claim regarding the introduction of Chandler's videotaped testimony at trial was not contrary to or an unreasonable interpretation of established Supreme Court precedent.

3. <u>Harmless Error</u>

Even if the state court's determination that there was no constitutional error was

10

contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, this Court would find the error harmless.  In examining harmlessness, this Court asks: "whether, in light of the record as a whole," the violation "'had a substantial and injurious effect or influence on the verdict.'"  *Brecht*, 507 U.S. at 638.  Whether a Constitutional error had a substantial and injurious effect is determined by considering several factors including the "importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

After a review of the record, this Court agrees with the Court of Appeal that the prosecution's case was "virtually indisputable" even without Chandler's brief testimony.  *Cabral*, slip op. at 19 (citing *Chapman v. California*, 386 U.S. 18 (1967)).  The overwhelming evidence of guilt in the record includes Maria's description of Cabral, his truck and trailer, as well as her photographic and in-court identification of Cabral, his truck and trailer.  It also includes Petitioner's wife's testimony that the black T-shirt used to cover Maria's face during and after the sexual assault was a shirt which she had purchased in London years before.  Additionally, multiple criminalist witnesses found that the hairs recovered from Cabral's truck and trailer were similar to Maria's in color, diameter, and structure and with similar length of regrowth on the roots which were.  Finally, there was evidence of DNA consistent with that of Cabral found in sperm samples taken from Maria after the incident.  *Id.* at 18-19.

The Court of Appeal properly found that Cabral suffered no Confrontation Clause violation.  Additionally, this Court finds that even if Petitioner had suffered a Confrontation Clause violation, the error was harmless under *Brecht*.  For these reasons, Petitioner's claim of a Sixth Amendment violation must be DENIED.

**II.**     **<u>Ineffective Assistance of Counsel</u>**

11

Petitioner also contends that trial counsel provided ineffective assistance of counsel by failing to request an alibi instruction. He claims that because his defense was based almost solely on the claim that he was not in Hollister at the time of the crime, a reasonable attorney would have requested an alibi instruction.

a. Legal Standard

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

b. Analysis

1. Performance

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697. The Court of Appeal noted that Petitioner "may have been" entitled to an alibi instruction, but did not explicitly determine that the trial counsel was ineffective for not requesting such an instruction. Instead, the appellate court first analyzed the effect of the omitted instruction on the jury's verdict.

2. Prejudice

A proper investigation of prejudice involves considering "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. The Ninth Circuit has recognized that "not every instance of counsel's ineffective handling of the jury instructions requires vacation of the underlying convictions." *United States v. Span*, 75 F.3d 1383, 1391 (9th Cir. 1996).

In this case the Court of Appeal reviewed the record and found that the evidence of guilt was overwhelming and that prejudice had not been established. This Court finds that determination was not an unreasonable application of established federal law. The Court of Appeal considered the viability of the alibi claim against the rest of the prosecution's case and determined the following: "(b)ased upon the strong evidence of guilt, which was amply corroborated, and the extreme weakness of the alibi evidence, we are convinced there is no reasonable probability that a more favorable determination would have resulted if defendant's trial counsel had requested and the court had given an alibi instruction." *Cabral*, slip op. at 21. The strong evidence of guilt found by the Court of Appeal, set forth above in Section I(b)(3), includes Maria's identification of defendant and his possessions, coupled with DNA evidence and the analysis of hairs found at the crime scene. *Id.* at 21.

The alibi evidence offered at trial included testimony by two construction workers who may have been present at the house defendant shared with his wife during the morning hours of February 26, 1999, the day of the assault. *Id.* at 20. One witness, Kevin Parkin testified that he believed the "husband" was in the bedroom on February 26, 1999 when Parkin arrived between 10:30 and noon. RT at 789. However, Parkin did not actually see him that day, nor did he recognize Petitioner in the courtroom at trial. RT at 789, 785. The other witness, Darryl Garrish, testified that he saw a man sleeping in Petitioner's San Bruno house around 10:30 a.m. on a Friday in late February. RT at 744-748. However, this conflicted with evidence at trial of Petitioner's statement to the police that he did not arrive in San Bruno until 11:15-11:30 a.m. *Cabral*, slip op. at 20.

The Court of Appeal found that there was no reasonable probability that the jury decision would have been different if counsel had requested an alibi instruction. To succeed on an ineffective assistance of counsel claim, Petitioner is required to show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Span*, 75 F.3d at 1390 (citing *Strickland*, 466 U.S. at 687). As

13

discussed in Section I(b)(3) above, the evidence of guilt in the record was overwhelming. Petitioner has not shown that the omission of an alibi instruction had a substantial and injurious effect on the verdict. Thus, the state court's determination that Cabral did not suffer an error so prejudicial that the reliability of his conviction is in question is not contrary to or an unreasonable interpretation of established Supreme Court precedent. For this reason, Petitioner's claim of ineffective assistance of counsel must be DENIED.

## **CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: July 19, 2006

_____
JEFFREY S. WHITE
United States District Judge